PHILLIP A. TALBERT
United States Attorney
ROBERT L. VENEMAN-HUGHES
JUSTIN J. GILIO
Assistant United States Attorneys
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>MAITE CELIS SILVA,<br><br>　　　　　　　　Defendant. | CASE NO. 1:24-CR-00265-KES-BAM<br><br>MOTION TO SET *NEBBIA* HEARING PURSUANT TO 18 U.S.C. § 3142(G)<br><br>COURT:　Hon. Kirk E. Sheriff<br>TIME:　　9:30 AM<br>DATE:　　November 18, 2024 |

　　　The United States of America, by and through Philip A. Talbert, United States Attorney, and Robert L. Veneman-Hughes and Justin J. Gilio, Assistant United States Attorneys, objects to the defendant's release on bond as discussed in court on November 4, 2024, and requests the court set a hearing pursuant to 18 U.S.C. § 3142(g)(4): "the judicial officer … shall upon the motion of the government, conduct an inquiry into the source of the property … offered as collateral to secure a bond." The United States has the right to request to "identify the source of funds" when bail is proffered. *United States v. Rubenstein*, 971 F.2d 288, 297 (9th Cir. 1992) (citing *United States v. Nebbia*, 37 F.2d 303, 304 (2nd Cir. 1966)).

　　　The Court must "satisfy itself that there is more than just a financial assurance that a bailed defendant will appear in court when required. … [i]f the security comes from an illegitimate source, and is merely a "business" expense for a dealer in contraband, there is a a[sic] paucity of moral force

MOTION TO SET NEBBIA HEARING　　　　　　　　1

compelling a defendant to reappear." *United States v. DeMarchena*, 330, F. Supp. 1223, 1226 (S.D. Cal. 1971).

As discussed thoroughly in the government's motion for reconsideration, Doc. 93, the government believes that the bond, "because of its source, will not reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(g)(4).

Particularly, the government believes that at least some of the money has been transferred to the defendant's family from her criminal enterprise, and that money from that enterprise exists to pay back a $20,000 bond posted by her family. In Doc. 93, the government proffered three different bases for its concerns about the bond:

(1) The defendant and her co-defendant boyfriend had a conversation in messages where the defendant told him that "I'm going to send money to my parents … from the money you earn." The co-defendant, who is the father of defendant's daughter, later said that his "daughter has almost 100 million in your parents' house." 100 million Chilean pesos is approximately $100,000 in U.S. dollars. This is significant because it calls into question the source of funds provided by the defendant's parents and shows the defendant's ability to repay a cash bond to her parents in the case of flight.

(2) The defendant took at least ten pictures of her co-defendant boyfriend holding large stacks of cash. In some cases, the cash was still bank-banded, and many of the photos were taken near in time to known bank robberies. The defendant was visible in at least two of these pictures, and she made a $13,000 cash deposit not long after some of the pictures were taken. This is significant because it shows the defendant's ability to repay a cash bond to her parents in the case of flight.

(3) The defendant saved pictures of two wire transfers to her family by a co-conspirator, and the government found wire transfer evidence of a third transfer. The total of those transfers was $7,980. This is significant because it shows the willingness and ability of other members of the conspiracy to send money to the defendant's family and calls into question the source of the funds they are using to post the cash bond.

On the afternoon of November 13, defendant informed the government that her mother, C.S., would be the "surety" for the bond. However, defendant indicated the Ms. Silva was not providing any of the money towards the bond. Instead, defendant's father, P.C.Z., provided $7000, her uncle, I.R.H., provided $3000, and her cousin, P.S., provided $10,000. According to an email from defense counsel, P.S.'s $10,000 is a short-term loan and the defendant's parents "have a plan to repay [P.S.] expediently."

Defendant provided several supporting documents, including receipts of bank transfers from Chile to the U.S. account of P.S. from accounts belonging to P.C.Z. and I.R.H. and documents showing that P.C.Z. owns a business in Chile. The government is satisfied that P.C.Z. and I.R.H. did actually transfer a total of $10,000 to P.S., and that P.S. provided the additional $10,000 from his checking account.

However, no bank statements were provided from P.C.Z., I.R.H., or P.S. showing the source of the money they provided, particularly in light of the transfers from co-conspirators to members of her family[1]. No business records showing P.C.Z.'s income were provided that show his ability to repay P.S.

Moreover, the existence of records showing that P.C.Z. can cover the $20,000 bond would not be sufficient alone. P.C.Z.'s financial ability to loan his daughter $20,000 is not sufficient to insure her appearance if she can repay that $20,000 as a "business" expense from her criminal activity to insure her return to Chile. The government believes that there needs to be reliable evidence before the court that these funds will insure her appearance and will not be backfilled by illegal proceeds.

Towards that end, the government seeks to cross-examine C.S., P.C.Z., I.R.H., and P.S., the invididuals who have provided funds towards the $20,000 bond, to test their credibility, learn the source of their funds, determine whether they expect to be repaid by Celis, and ascertain what about their circumstances makes the defendant likely to appear.

Because this hearing concerns many of the same issues as the government's motion to reconsider, Doc. 93, the government requests it be set on the same date and time as that motion, unless defense counsel requires more time to produce witnesses or prepare for the hearing.

---

[1] Significantly, CELIS' father P.C.Z. put up $7000, while the government has seen records showing at least $7980 transferred to CELIS' mother and what appears to be her brother.

MOTION TO SET NEBBIA HEARING     3

1
2  Dated: November 13, 2024                    PHILLIP A. TALBERT
                                              United States Attorney
3
4                                       By:   /s/ ROBERT L. VENEMAN-HUGHES
                                              ROBERT L. VENEMAN-HUGHES
                                              JUSTIN J. GILIO
5                                             Assistant United States Attorneys
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28